KING, C.J.,
for the Court.
¶ 1. Bernita J. Washington filed a workers’ compensation claim for injuries to her neck and lower back that she alleged resulted from her fall at work on December 14, 2001. Washington’s employer, Woodland Village Nursing Home, and its insurance carrier, Bridgefield Casualty Insurance Company (collectively, Woodland), paid Washington temporary total and temporary partial disability benefits and medical expenses, including the cost of her neck *345 surgery. Subsequently, Washington sought approval from Woodland for lower back surgery and for a second surgical procedure on her neck, for which approval was denied. After a hearing, an administrative law judge determined that: (1) Washington did suffer a work-related neck injury on December 14, 2001; (2) further factual development was required to determine whether Woodland should be responsible for the cost of lumbar surgery; (3) Washington’s neck condition was resolved; (4) Washington had attained maximum medical improvement despite the conflicting testimony regarding her need for further cervical surgery; and (5) Washington had failed to prove any permanent disability.
¶2. The Mississippi Workers’ Compensation Commission affirmed the decision of the administrative law judge. Both Washington and Woodland appealed to the circuit court, which affirmed the decision of the Commission. Washington now appeals, raising the following issues:
I. WHETHER THE ISSUE OF PERMANENT DISABILITY WAS PROPERLY BEFORE THE COMMISSION FOR RESOLUTION.
II. WHETHER THE COMMISSION ERRED AS A MATTER OF LAW AND FACT IN FINDING THAT WASHINGTON WAS NOT IN NEED OF FURTHER CERVICAL SURGERY.
III. WHETHER THE COMMISSION ERRED AS A MATTER OF LAW AND FACT IN FINDING THAT WASHINGTON’S CONTEMPLATED LUMBAR SURGERY “SHOULD BE SCRUTINIZED BY THE EMPLOYER AND CARRIER, AND AT PRESENT, ANY LUMBAR SURGERY IS NOT TO BE CONSIDERED THE RESPONSIBILITY OF THE EMPLOYER AND CARRIER.”
IV.WHETHER THE COMMISSION ERRED AS A MATTER OF LAW AND FACT IN DETERMINING THAT WASHINGTON WAS NOT ENTITLED TO PERMANENT DISABILITY BENEFITS DUE TO THE FACT THAT SHE DID NOT MAKE REASONABLE EFFORTS TO FIND ALTERNATIVE EMPLOYMENT.
Woodland cross-appeals, raising the following issues:
I. WHETHER THE COMMISSION ERRED AS A MATTER OF LAW IN FINDING THAT THE CLAIMANT SUSTAINED A WORK-RELATED INJURY ON DECEMBER 14, 2001.
II. WHETHER THE COMMISSION ERRED AS A MATTER OF LAW AND FACT IN FINDING THAT WASHINGTON WAS NOT IN NEED OF FURTHER CERVICAL SURGERY.
¶ 3. We affirm in part and reverse and remand in part. We find that the issue of permanent disability exceeded the scope of the hearing; therefore, the Commission erred by determining that there was no permanent disability. Accordingly, we reverse the Commission’s determination that Washington was not permanently disabled; the merits of that issue may be determined by the Commission at the appropriate time. In all other respects, we find that the Commission’s decision was supported by substantial evidence and was not arbitrary and capricious.
FACTS
¶ 4. Washington was forty-five years old at the time of the July 20, 2005, hearing before the administrative law judge. Her educational background included high school and two years of college. She had worked as a bank teller, a switchboard operator, a bookkeeper, a cashier, and a *346 certified nursing assistant. Washington worked as a certified nursing assistant at Woodland Village Nursing Home beginning in November 2000. Licensing problems prevented her working during the period of March 2001 to August 2001. Washington’s duties included resident care such as responding to calls, bathing residents, assisting with their personal hygiene, serving food, changing bed linens, and cleaning. According to Washington, on December 14, 2001, while retrieving a wheelchair for a dizzy resident, she slipped and fell on a wet spot, “flipped backwards,” and lost consciousness. Washington thought that she struck her head on a nearby laundry cart as she fell. No one witnessed the accident. However, Washington testified that after she fell, another employee indicated that she was about to put out a wet floor sign before Washington’s fall occurred.
¶ 5. The employer’s first report of injury reflects that Washington hurt her forehead, wrist, thumb, and lower back. Washington went to the emergency room at Hancock Medical Center and saw Dr. Fredo Knight. On December 17, 2001, Washington visited the company doctor, Dr. Charles Kergosian, who treated her for a lumbar sprain, a cervical sprain, and a sprained left wrist. Dr. Kergosian initially took Washington off work, but he released her to return on January 7, 2002. Because Washington had continuing problems, Dr. Kergosian ordered physical therapy. On March 18, 2002, the physical therapist recommended that Washington be discharged, noting that though Washington had missed six appointments, she was much improved.
¶ 6. On March 28, 2002, Washington saw her family physician, Dr. David Roberts. Dr. Roberts ordered a lumbar MRI, which was performed on April 3, 2002, and it showed disc protrusion at the L5-S1 level on the left side encroaching on the nerve root at that level. Dr. Roberts referred Washington to a neurosurgeon, Dr. Terry Smith. Washington saw Dr. Smith on April 20, 2002. She complained of headaches, swelling in the left temple and neck, pain in her left arm, and lower back pain occasionally radiating to both legs. Dr. Smith ordered an MRI of the cervical spine, which showed a disc protrusion on the left at the C4-5 level with neural fora-minal narrowing. Dr. Smith noted that while the MRI results did not explain Washington’s diffuse complaints, it did explain her left neck, shoulder, and arm pain. Dr. Smith recommended epidural injections for the pain. Washington subsequently returned to Dr. Smith and reported that the injections had not helped. Dr. Smith recommended that Washington undergo surgery. When Washington mentioned her lower back problems, Dr. Smith responded that they needed to deal with her neck first. Dr. Smith released her to return to work with restrictions after August 24, 2002. However, Woodland did not permit her to return due to the contemplated surgery.
¶ 7. On December 5, 2002, Dr. Smith performed an anterior cervical corpectomy and fusion at the C4-5 level. On January 18, 2003, Dr. Smith ordered physical therapy for Washington; she made excellent progress in physical therapy. Dr. Smith ordered a functional capacity evaluation (FCE), which was performed on April 5, 2003, and it showed Washington could perform at the light duty level, which fit her job requirements. On April 15, 2003, Dr. Smith found that Washington had reached maximum medical improvement regarding her neck, and he released her to light duty. Based on the FCE, Dr. Smith restricted Washington to lifting a maximum of thirty-five pounds, to carrying a maximum of forty-five pounds, to making frequent position changes, and to a maximum *347 of four hours of work per day for the first two weeks to build up her endurance. Washington returned to work, but one week later, she returned to Dr. Smith complaining of neck and lower back pain. Dr. Smith found that she had good range of motion in the neck and normal strength, reflexes, and gait. Dr. Smith merely informed Washington that it would take some time to get back into the “swing of things” at work.
¶ 8. Attendance records for May 2003 show that Washington continued to work four-hour days at Woodland despite Dr. Smith’s instruction that she could return to full time after two weeks. Woodland requested that Washington provide medical documentation justifying her limited schedule. In response, Washington forged and hand-delivered a note with Dr. Smith’s signature dated June 2, 2003. This note stated that Washington could only work four-hour days with no pushing or pulling. At her deposition, Washington admitted that she had forged this note by using wording from her copies of Dr. Smith’s medical records and the FCE. Washington submitted two subsequent forgeries to Woodland purporting to be from Dr. Smith. A forgery dated October 11, 2003, asserted that Washington could only work four-hour days with various restrictions. A later forgery dated December 12, 2003, stated that Washington could work only four-hour days, but she also could not work four or five straight days in a row, and she could only work a.m. hours. Washington testified that she submitted these forgeries because she was afraid she could not perform at full duty and was afraid of being terminated for failing to perform at full duty.
¶ 9. During the fall of 2003, Washington continued to see Dr. Smith, and she received lumbar injections and a TENS unit. On December 12, 2003, Dr. Smith recommended that Washington undergo surgery on the disc protrusion on the left side of her lumbar spine. Washington worked eight-hour days on December 24-26, 2003. She testified that this work schedule caused her to suffer severe pain, and she went to the emergency room at her own expense. On January 5, 2004, she saw a new physician, Dr. Rowe Crowder, who instructed her not to work and ordered a cervical MRI. On January 6, 2004, Woodland had a meeting with Washington and requested that she obtain documentation from Dr. Smith certifying that she was able to work while taking prescription medication. On January 24, 2004, she had a follow-up visit with Dr. Smith. He reviewed the MRI obtained by Dr. Crowder and opined that he did not see anything that would warrant further cervical surgery. Dr. Smith stated that while awaiting workers’ compensation authorization for Washington’s lumbar surgery, Washington could return to work at regular duty, but she was restricted from pushing a water cart for two weeks.
¶ 10. Washington never returned to Woodland, and she was terminated in February 2004. Starann Lamier, an administrator at Woodland, testified that Woodland terminated Washington after discovering the forgeries, but otherwise, Woodland would have allowed Washington to work within her restrictions. Another administrator, Faye Hunt, submitted an affidavit swearing that from April 2003 to January 2004, Woodland had forty hours of work per week available to Washington. During the time that she worked four-hour days under the forged restrictions, Washington continued to receive workers’ compensation benefits for a full day, and later for a partial day. On June 27, 2005, Washington pleaded guilty in the Circuit Court of Hancock County to insurance fraud. She was given a three-year suspended sentence with probation and or *348 dered to pay restitution to the carrier. She waived any claim to indemnity benefits paid during that time frame.
¶ 11. On May 27, 2004, Dr. Moses Jones, a neurosurgeon, conducted a medical evaluation of Washington at Woodland’s request. Dr. Jones compared Washington’s preoperative MRIs with a cervical MRI dated January 20, 2004, and a lumbar MRI dated February 2, 2004. Dr. Jones found that Washington’s cervical spine showed degenerative and postoperative changes, with some canal narrowing, but there were no acute changes such as a herniated disk or evidence of nerve root compression. He noted some degenerative changes in the lumbar region but no neural impingement and nothing that correlated with her symptomatology. Dr. Jones opined that surgical intervention would be of no value, and he gave Washington an impairment rating of five percent to the body as a whole attributable to her cervical spine operation. He opined that she could resume all normal activities and return to work without restrictions.
¶ 12. Dr. Smith provided his opinions about Washington’s condition in a July 10, 2004, letter to Woodland’s counsel. Dr. Smith opined that Washington’s diagnosis was cervical and lumbar abnormalities with a poor prognosis for further recovery. He opined that she was a candidate for the surgery he had recommended,[1] but that without further surgery, she had an impairment rating of five percent to the body as a whole. Dr. Smith stated that Washington should not significantly change should she have the surgery. He said if she had the surgery she would be disabled for six weeks, and she could then return to her previous duties with no restrictions.
¶ 13. On June 24, 2004, Washington saw Dr. Jeffrey Oppenheimer, a neurosurgeon, at her own expense on a referral from Dr. Crowder. Washington complained of neck pain, shoulder pain, left-sided arm pain, migraine headaches, and pain and tingling in the left leg. Dr. Oppenheimer noted that Washington had voice problems as the result of the cervical surgery. He ordered a myelogram of the lumbar and cervical spine and nerve conduction studies of the upper and lower extremities. His opinion after these tests concerning the cervical spine was that Washington had significant adjacent level disease at C6-7 which was pressing on her spinal cord. He anticipated that Washington needed a C3-4, C4-5, C5-6, and C6-7 anterior cervical discecto-my and fusion with plating, replacement of her old plate, and replacement of the previous fusion. He also recommended an evaluation by an otorhinolaryngologist to document paralysis of the right vocal cord as the result of the previous surgery. Concerning the lumbar spine, he opined that she had lateral recess stenosis at L3-4 and L4-5. Dr. Oppenheimer recommended a staggered L3 through 5 decom-pressive laminectomy six weeks following the cervical surgery.
¶ 14. The administrative law judge ordered an independent medical evaluation by a neurosurgeon, Dr. Eric Wolfson. Dr. Wolfson saw Washington on February 14, 2005. Washington reported that she had experienced no improvement after her neck surgery, and in fact, her left arm symptoms had worsened. Dr. Wolfson observed marked decreased range of motion in the neck. He reviewed Washington’s cervical and lumbar MRIs and the records of Drs. Smith and Oppenheimer. His impression was persistent cervical radiculo-pathy after her neck surgery, with a postoperative complication affecting her voice, and lumbar discogenic pain syndrome. Dr. Wolfson opined to a reasonable degree *349 of medical certainty that Washington’s intractable cervical condition was the result of the work-related injury of December 14, 2001, and that she needed future cervical surgery secondary to adjacent level disease, which is a common sequella of the type of surgery she underwent with Dr. Smith. Dr. Wolfson opined that Washington’s lumbar condition also resulted from the work-related injury and that she needed future treatments, which may include lower back surgery. Dr. Wolfson recommended further testing in the form of a lumbar discogram prior to surgical management of her lower back condition.
¶ 15. Medical records pertaining to a car accident on March 3, 2000, were admitted into evidence. These records indicated that the car in which Washington was traveling as a passenger was struck from behind by another vehicle. Washington sought medical treatment from Dr. Alan Johnston for her injuries, which included cervical and lumbar pain. A radiologist’s report of a MRI of the cervical and lumbar spine dated June 14, 2000, stated: “C3-4, C4-5 and C5-6 disc protrusions as noted above with cord compression at all those levels and apparent left C5 nerve root impingement at the C4-5 disc level.” Also, mild central protrusion of L5-S1, slightly asymmetric to the left, was apparent. Another record indicated that despite continuing cervical pain and a recommendation that further treatment was necessary, Washington requested to be discharged so that she could return to work. This occurred approximately one month before Washington commenced work at Woodland. When confronted with this MRI reading at his deposition, Dr. Wolf-son opined that it was indicative of abnormalities caused by the car accident, but based upon the onset of symptoms subsequent to Washington’s fall, the fall had aggravated those prior abnormalities.
¶ 16. Washington testified about her desire for further surgery. She testified that it was hard to swallow and that her speech doctors said that the plate from her neck surgery must be removed. Washington testified that she has headaches, her neck is very swollen, and she has problems driving. Additionally, Washington testified that she has back pain radiating to her buttocks and thighs. She said she has difficulty sleeping in bed and must sleep on the sofa, where she can position herself for maximum back support.
¶ 17. The administrative law judge found that Washington had sustained a work-related aggravation of a cervical condition that had been resolved. The administrative law judge noted the conflicting testimony on the need for further cervical surgery, but the judge determined that even without surgery Washington was at maximum medical improvement. The administrative law judge found that the cost of the contemplated lumbar surgery should not be borne by Woodland “without further development as to whether or not the need for surgery is present, whether or not the claimant is desirous of this surgery, which physician would be asked to perform this surgery and conclusory medical opinions that the surgery is related to the original admitted injury.” The administrative law judge also found that Washington had made no efforts to locate alternative employment although she was at maximum medical improvement. The administrative law judge found from the fact that Woodland would have offered Washington work, but for the forgeries, that there was a presumption of no lost wage-earning capacity and, thus, no permanent disability. Finally, the administrative law judge rejected Woodland’s public policy argument that Washington’s fraud should cause a forfeiture of all her rights to benefits under the Workers’ Compensation Act. *350 The Commission affirmed the administrative law judge’s decision.
STANDARD OF REVIEW
¶ 18. This Court has a limited standard of review of decisions of the Commission. Raytheon Aero. Support Servs. v. Miller, 861 So.2d 330, 335(¶ 9) (Miss.2003). Though it is generally the administrative law judge that hears the live testimony, the Commission is the ultimate fact-finder, and it is the Commission’s decision that is entitled to appellate deference. Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1245 (Miss.1991). To the extent that the Commission accepts the administrative law judge’s findings and conclusions, this Court reviews those findings and conclusions as those of the Commission. McDowell v. Smith, 856 So.2d 581, 585(¶ 10) (Miss.Ct.App.2003).
¶ 19. We will not reverse the Commission unless the Commission’s decision was not supported by substantial evidence or was arbitrary and capricious. Id. “Arbitrariness and caprice are in substantial part a function of the presence vel non of credible evidence supporting the agency decision. Where we find such evidence, we have no more authority to interfere with the decision of the Commission than we do in a case of any other administrative body.” Walker Mfg. Co., 577 So.2d at 1247. “It is not the role of the [appellate] courts to determine where the preponderance of evidence lies when the evidence is conflicting, given that it is presumed that the Commission, as trier of fact, has previously determined which evidence is credible and which evidence is not.” Hale v. Ruleville Health Care Ctr., 687 So.2d 1221, 1224-25 (Miss.1997). “The legal effect of the evidence and the ultimate conclusions drawn by the commission from the facts ‘are questions of law, especially where facts are undisputed or overwhelming evidence reflects them.’ ” M. T. Reed Constr. Co. v. Garrett, 249 Miss. 892, 897, 164 So.2d 476, 478 (1964) (quoting Cent. Elec. Power Assn. v. Hicks, 236 Miss. 378, 388-89, 110 So.2d 351, 356 (1959)).
LAW AND ANALYSIS
I. WHETHER THE COMMISSION ERRED AS A MATTER OF LAW IN DECIDING THE ISSUE OF PERMANENT DISABILITY.
II. WHETHER THE COMMISSION ERRED AS A MATTER OF LAW AND FACT IN DETERMINING THAT WASHINGTON WAS NOT ENTITLED TO PERMANENT DISABILITY BENEFITS DUE TO THE FACT THAT SHE DID NOT MAKE REASONABLE EFFORTS TO FIND ALTERNATIVE EMPLOYMENT.
¶ 20. Because Washington makes a single argument pertaining to both of these issues, we address them together. Essentially, Washington argues that the administrative law judge erred by finding that she failed to prove she was permanently disabled because the issue of permanent disability was outside the scope of the hearing. “‘Disability’ means incapacity because of injury to earn the wages which the employee was receiving at the time of the injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.” Miss.Code Ann. § 71 — 3—B(i) (Rev.2000). A determination of “permanent disability” is a determination of whether and to what extent the claimant has incurred a permanent loss in wage-earning capacity as a result of the injury. Id.; see Miss.Code Ann. § 71-3-17(a) and (c) (Rev.2000). A claimant bears the burden of proof of lost wage-earning capacity. McCarty Farms, Inc. v. Kelly, 811 So.2d 250, 254(¶ 11) (Miss.Ct.App.2001). We must determine whether the hearing en *351 compassed the issue of permanent disability such that Washington was obliged to present her case on the issue at that time.
¶ 21. At the commencement of the hearing, the administrative law judge gave the following statement concerning the hearing’s scope:
All right, the cause number here is H-5941. What I understand the issues are — are we going back to causation, whether or not a work-related injury occurred on or about the date alleged in the Petition to Controvert, and if so, the existence, nature and extent of disability attributable thereto, inclusive of the fact that additional surgery has been recommended, and whether or not the Employer and Carrier should be responsible for that surgery. And/or any result of disability will have to be the subject of another hearing if such is found to be compensable. Is there anything that I missed ... ?
It was then agreed that the administrative law judge would also address Woodland’s public policy argument that Washington’s fraud caused a forfeiture of workers’ compensation benefits.
¶ 22. Washington argues that the hearing was limited to a determination of whether Washington suffered a work-related injury, whether that injury was com-pensable despite her fraud, and whether the Commission would approve the costs of the additional surgeries recommended by Dr. Smith, Dr. Oppenheimer, and Dr. Wolfson. Washington avers that the issue of permanent disability was outside the scope of the hearing. As an indicator that another hearing was contemplated on the issue of permanent disability, she points to the administrative law judge’s statement that “any result of disability will have to be the subject of another hearing if such is found to be compensable.”
¶ 23. Woodland argues that the issue of permanent disability was within the scope of the hearing. Woodland points to the fact that Washington never amended her pretrial statement of August 28, 2003, which provided that the contested issues included: “the existence/extent of any permanent disability attributable to the injury.” Woodland also asserts that the administrative law judge specifically stated that permanent disability would be determined by reciting the issues as “whether or not a work-related injury occurred on or about the date alleged in the Petition to Controvert, and if so, the existence, nature and extent of disability attributable thereto.”
¶ 24. We review this issue with reference to the case of Monroe v. Broadwater Beach Hotel, 593 So.2d 26 (Miss.1992). In Monroe, the claimant sustained a compen-sable injury to her knee. Id. at 27. Later, Monroe filed a motion under Mississippi Workers’ Compensation Commission General Rule 9 for a hearing on her request for additional medical treatment for her back injury, which she alleged was aggravated by the medical care of her knee injury.[2] Id. at 27, 29. At the hear *352 ing, Monroe’s presentation of evidence almost entirely concerned the connection between Monroe’s knee injury and her back injury. Id. at 31. The administrative law judge found that Monroe’s back injury was not work related; thus, she was not entitled to compensation for treatment for her back injury. Id. at 29. However, the administrative law judge made additional findings that Monroe’s knee injury was work related, that she had reached maximum medical recovery for the knee injury, that she had sustained a fifty-percent industrial loss of use of the knee attributable to the employment; the judge also apportioned her benefits and expenses. Id. The Commission affirmed the decision of the administrative law judge, and the circuit court affirmed the Commission’s decision. Id. at 27.
¶ 25. Monroe appealed, complaining that the Commission erred by determining issues outside the scope of the hearing, which was limited to a determination of whether the employer was responsible for the medical care of Monroe’s back injury. Id. at 29. The supreme court agreed, and the court reversed and remanded. Id. at 31. The supreme court noted that the administrative law judge had announced the scope of the hearing by stating: “[Ijt’s not a hearing on the merits of the claim. It’s strictly a hearing on the motion for an immediate hearing, under Rule 9 to determine whether the Claimant is suffering from improper or lack of medical treatment.” Id. at 30. The supreme court recognized that while the hearing testimony had focused exclusively on the connection between the knee and back injuries, Monroe had placed depositions into the record that included information outside of the narrow question of whether she needed additional medical treatment. Id. However, the supreme court held that “[t]he introduction of information on matters outside the subject matter of the hearing does not allow the administrative law judge to decide matters beyond the scope of the hearing.” Id. at 30-31. The supreme court stated that:
An administrative law judge may not announce a limited purpose of a hearing, require the litigants to argue under limitation, and then decide the whole of the case including time of maximum recovery apportionment and compensation. A claimant is entitled to know: “This hearing is ‘it’; now is my time to put on my total case and expect a final decision.” The ruling as rendered below assumes totality of evidence and finality of result and indeed leaves us unsure as to additional proof and additional dispositions. The Commission or administrative law judge might not perceive additional evidence or legal precedent, but we have a diligent and imaginative bar. Left unfettered, Monroe’s case may be more completely developed than intended. Certainly, a claimant cannot be [led] into a partial hearing and have the whole claim determined.
Id. at 31. The supreme court emphasized that the issue was whether the claimant had notice that the issue of permanent disability was to be tried, and the presence of evidence pertaining to permanent disability in the hearing record was not determinative of this question. Id.
¶26. In Twine v. City of Gulfport, 833 So.2d 596, 601(¶ 14) (Miss.Ct.App.2002), the claimant argued that the administrative law judge exceeded the scope of a *353 Rule 9 hearing by determining the merits of the ease, including permanent disability. Citing Monroe, Twine argued that she had been unprepared for a full hearing on the merits. Id. Again focusing on the question of notice, this Court rejected Twine’s argument because several factors indicated that Twine was on notice that the hearing would be on the merits. Id. at 601-02 (¶¶ 14-17). First, the Commission’s order granting Twine’s motion for an expedited hearing stated that after sixty days of active discovery, a hearing on the merits of the issue of permanent disability would occur. Id. at 601(¶ 15). Twine never filed an objection to the order. Id. Second, the notice of hearing stated that the hearing was to be on the merits, and Twine never objected to the hearing on the merits or requested rescheduling. Id. Third, Twine’s situation was distinguishable from Monroe because the administrative law judge did not give Twine any indication that the hearing would be anything other than on the. merits of the permanent disability issue. Id. at 602(¶ 16). Based upon this evidence regarding the scope of the hearing, we held that the administrative law judge properly adjudicated the issue of permanent disability. Id. at (¶ 17).
¶ 27. In this case, Washington’s pretrial statement two years before the July 20, 2005, hearing stated that permanent disability was a contested issue. However, in 2004, Washington filed two requests for a Rule 9 hearing to provide medical treatment, one requesting authorization for lumbar injections and one requesting authorization for the lumbar surgery recommended by Dr. Smith. Therefore, the pretrial statement predated Washington’s request for a Rule 9 hearing; the last hearing requested by Washington was a Rule 9 hearing. Because Washington’s latest request was for a Rule 9 hearing, Washington’s earlier pretrial statement is of limited value in determining whether or not she had notice that the hearing encompassed permanent disability.
¶ 28. As in Monroe and Twine, we look to the statement of the administrative law judge to determine whether the administrative law judge gave Washington notice that the hearing would be on the merits of her permanent disability claim, or whether the hearing would merely determine her claim for authorization for medical treatment, as well as the employer’s argument that the injury was not compensable. The administrative law judge’s statement contained two references to disability. In the first reference, the administrative law judge stated that the existence, nature, and extent of disability attributable to any work-related injury, inclusive of the recommendation for additional surgery, would be determined at the hearing; in the second reference, the administrative law judge stated that the result of any com-pensable disability that was found would be the subject of another hearing.
¶ 29. These two references to disability initially appear ambiguous, but a reasonable meaning can be discerned considering them in light of the several meanings of “disability” in workers’ compensation law. “Medical” or “functional” disability relates to a claimant’s actual physical impairment, while “industrial” disability refers to the impact of the physical impairment upon the claimant’s ability to perform the duties of employment. Robinson v. Packard Elec. Div., Gen. Motors Corp., 523 So.2d 329, 331 (Miss.1988). Industrial disability consists of a medical impairment that caused a loss of wage-earning capacity. Id. (citing Miss.Code Ann. § 71-3-3(0). With these principles in mind, the “existence, nature, and extent of disability inclusive of the recommendation for additional surgery” to be determined at the hearing most logically re *354 ferred to Washington’s medical disability. The “result” of disability to be determined at a later hearing most logically referred to Washington’s industrial disability. That is, if it was determined at the initial hearing that Washington suffered a com-pensable injury, any permanent loss of wage-earning capacity Washington incurred as a result of that compensable injury was to be determined at a later hearing.
¶ 30. We recognize Woodland’s argument is that the statement referring to a second hearing meant that another hearing would occur only if further surgery were authorized and obtained. Because no further surgery was authorized, Woodland argues, the administrative law judge correctly proceeded to the issue of permanent disability. We reject this argument for two reasons. First, the administrative law judge stated that a second hearing was to occur on the “result” of disability if “such [disability]” was found to be compensable, not if further surgery was authorized. Indeed, Washington’s medical disability was found to be compensable, leading to the conclusion that a second hearing would occur on its “result.” Second, we construe any ambiguity inherent in the administrative law judge’s statement in favor of Washington on the basis that “a claimant is entitled to know”: “This hearing is ‘it’; now is my time to put on my total case and expect a final decision.” Monroe, 593 So.2d at 31. The administrative law judge’s statement communicated that a second hearing would occur on the “result” of disability if the injury were found to be compensable; this reasonably communicated to Washington that there was no need to put on evidence of loss of wage-earning capacity until the second hearing.
¶ 31. We find that the administrative law judge erred by prematurely determining the issue of permanent disability because Washington was not on notice that the hearing would encompass the issue of permanent disability. Construing any ambiguity in favor of Washington, it is fairly apparent that the administrative law judge informed the parties that the issue would be determined at a later time. Therefore, we reverse the finding of the Commission that Washington was not permanently disabled. Washington may raise this issue before the Commission at the appropriate time.
III. WHETHER THE COMMISSION ERRED AS A MATTER OF LAW AND FACT IN FINDING THAT WASHINGTON WAS NOT IN NEED OF FURTHER CERVICAL SURGERY.
IV. WHETHER THE COMMISSION ERRED AS A MATTER OF LAW AND FACT IN FINDING THAT WASHINGTON’S CONTEMPLATED LUMBAR SURGERY “SHOULD BE SCRUTINIZED BY THE EMPLOYER AND CARRIER, AND AT PRESENT, ANY LUMBAR SURGERY IS NOT TO BE CONSIDERED THE RESPONSIBILITY OF THE EMPLOYER AND CARRIER.”
¶ 32. Washington argues that the Commission erred by finding that she was not in need of further cervical surgery and that more factual development was necessary before Woodland should be held responsible for lumbar surgery. The administrative law judge stated that “there was sufficient medical evidence that the aggravation of the cervical region had now been resolved.” Washington argues that the finding was clearly erroneous and lacked the support of substantial evidence because three out of the four physicians whose medical records were submitted to the Commission opined that she needed further surgery. Washington acknowledges that Dr. Jones opined that no fur *355 ther surgery was necessary. However, she contends that the opinion of Dr. Jones, who saw Washington only once, was not substantial evidence supporting the Commission’s conclusion because Dr. Smith, Dr. Oppenheimer, and Dr. Wolfson all said she needed a second cervical surgery.
¶ 33. “Where medical expert testimony is concerned, this Court has held that whenever the expert evidence is conflicting, the Comb will affirm the Commission whether the award is for or against the claimant.” Raytheon Aero. Support Servs., 861 So.2cl at 336(¶ 13) (quoting Kersh v. Greenville Sheet Metal Works, 192 So.2d 266, 269 (Miss.1966)). “Where there is conflicting medical testimony, the Commission has the responsibility to apply its expertise and determine which evidence is more credible. We will uphold that determination unless it is clearly erroneous.” Wesson v. Fred’s Inc., 811 So.2d 464, 469(¶ 23) (Miss.Ct.App.2002). “[A] finding is clearly erroneous when, although there is some slight evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made by the [Commission in its findings of fact and in its application of the act.” Cent. Elec. Power Ass’n, 236 Miss. at 390, 110 So.2d at 356.
¶34. As discussed above, Dr. Smith performed Washington’s initial cervical surgery. Woodland correctly points out that Dr. Smith never recommended a second cervical surgery as averred by Washington. Rather, Dr. Smith opined that Washington did not need further cervical surgery, and she was at maximum medical improvement from her neck injury, though he later determined that she needed lumbar surgery. The only physicians who determined that Washington needed further cervical surgery were Dr. Oppenheimer, who treated Washington subsequent to Dr. Smith, and Dr. Wolfson, who conducted an independent medical evaluation.
¶ 35. We review the evidence pertaining to the Commission’s finding that Washington needed no further surgery because the aggravation of her cervical injury had been resolved. Dr. Wolfson reviewed Washington’s medical records documenting a prior neck injury that Washington had sustained in a car accident; he opined that the fall had aggravated the prior neck injury. Dr. Jones opined from Washington’s MRIs of the cervical spine that there was “no objective evidence to suggest that any surgical intervention would be of value,” and that Washington “had a good surgical procedure with the normally-expected results.” Dr. Jones testified that Washington could resume all her normal activities. Dr. Smith, Washington’s treating physician for workers’ compensation purposes, opined that Washington’s cervical condition had reached maximum medical improvement, and he did not see anything “that surgery would be of help for” in a post-surgical cervical MRI.
¶ 36. Washington argues that the Commission erred by rejecting the opinion of Dr. Oppenheimer, who treated Washington, and by accepting the testimony of Dr. Jones, who never treated Washington. This argument is without merit because the Commission’s finding that Washington did not need further cervical surgery was also supported by the opinion of her treating physician, Dr. Smith, who stated that she did not need further cervical surgery and that she had reached maximum medical improvement concerning her neck on April 15, 2003. Moreover, the Commission was entitled to rely upon the opinion of Dr. Jones, even though he never treated Washington. This Court has held that “while a treating physician’s opinion is without question of great import, the Commission is not required to abide by it or *356 required to give it any greater weight than other physicians’ opinions.” Richardson v. Johnson Elec. Auto. Inc., 962 So.2d 146, 152(¶ 16) (Miss.Ct.App.2007). The Commission is charged with determining the credibility of the witnesses before it and resolving conflicts in the medical evidence. Id. The opinions of Dr. Smith and Dr. Jones that Washington did not need another cervical surgery did not constitute such slight evidence that the Commission’s reliance upon them was clearly erroneous. We find that the Commission’s decision that Washington did not need further cervical surgery was supported by substantial evidence and was not arbitrary and capricious.
¶ 37. We turn to Washington’s argument that the Commission erred by finding that further factual development was necessary before Woodland was held responsible for providing her with lumbar surgery. Specifically, the administrative law judge stated that no lumbar surgery should be provided “without further development as to whether or not the need for surgery is present, whether or not the claimant is desirous of this surgery, which physician would be asked to perform this surgery and conclusory medical opinions that the surgery is related to the original admitted injury.” Washington argues that Dr. Wolfson’s opinion that the need for lumbar surgery was causally connected to her fall substantially supported her claim for lumbar surgery. Again, there was conflicting medical evidence in the record regarding Washington’s lumbar condition. At his deposition, Dr. Wolfson opined that Washington needed treatment, perhaps surgery, for a lumbar spine injury that she initially incurred during the car accident and later aggravated with the fall at work. Dr. Oppenheimer and Dr. Smith testified that she needed lumbar surgery, but they did not relate her lumbar condition to a work-related injury. Dr. Jones testified that there was no significant abnormality in Washington’s lumbar spine, and she could resume all normal activities. Evidently, the Commission believed that there was a possibility that Washington’s current lumbar problems were attributable to her fall and that she needed surgery, but more evidence was needed in order to make that determination in Washington’s favor. Given the conflicting medical evidence surrounding the issue, we cannot say that this decision was arbitrary and capricious.
ISSUES ON CROSS-APPEAL
I. WHETHER THE COMMISSION ERRED AS A MATTER OF LAW IN FINDING THAT THE CLAIMANT SUSTAINED A WORK-RELATED INJURY ON DECEMBER 14, 2001.
¶ 38. On cross-appeal, Woodland argues that the Commission’s decision that Washington sustained a work-related cervical injury on December 14, 2001, was not supported by substantial evidence. The administrative law judge found that Washington’s version of events was credible, stating that although no one witnessed the accident, this type of injury is common in the nursing home environment, and the claimant is competent to prove her own claim. The Commission agreed, stating that while due to the fraud, Washington’s claim was “doubtful, at best, ... we are duty bound to resolve this doubt in her favor.”
¶ 39. A workers’ compensation claimant must prove the following elements by a fair preponderance of the evidence: “(1) an accidental injury, (2) arising out of and in the course of employment, and (3) a causal connection between the injury and the death or claimed disability.” Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 13 (Miss.1994). Woodland argues that because the evidence before the Commission demonstrated that Washington was untrustworthy, the Commission erred by accepting *357 Washington’s uncorroborated testimony that she sustained an accidental injury at work. Woodland points to the following evidence as indicative of Washington’s untrustworthiness: (1) after her car accident, she obtained a release against medical wishes so she could return to the workforce; (2) she never disclosed her pre-existing injuries from the ear accident to Dr. Wolfson; (3) when Washington was asked to obtain her MRIs from the car accident injuries, they were “conveniently” unable to be located by the hospital; (4) Dr. Smith informed Woodland upon inquiry that he had not prescribed any pain medication for Washington in many months and that the source of her medication should be explored; and (5) Washington’s conviction of insurance fraud in the procurement of workers’ compensation benefits after she forged three medical records in order to remain on part-time, light-duty work. Woodland asserts that Washington’s neck problems actually arose from her prior car accident, not from a work-related injury.
¶ 40. As the administrative law judge recognized, a claimant is competent to prove her own claim; indeed, the Commission may accept the claimant’s testimony without corroboration. Penrod Drilling Co. v. Etheridge, 487 So.2d 1330, 1333 (Miss.1986). The claimant’s uncorroborated testimony should be accepted by the Commission unless it is inherently improbable, incredible, unreasonable, or shown to be untrustworthy; in that circumstance, the Commission may reject it. Id. “[T]he undisputed testimony of a claimant which is not so unreasonable as to be unbelievable, given the factual setting of the claim, generally ought to be accepted as true.” White v. Superior Prods., Inc., 515 So.2d 924, 927 (Miss.1987).
¶ 41. Certainly, Washington’s perpetration of insurance fraud was a most serious matter, and the Commission recognized that it cast doubt upon her general credibility. Nonetheless, Washington’s acts of fraud, while calling her general credibility into question, did not contradict her testimony about how the accident occurred. The administrative law judge found this testimony to be reasonable “given the factual setting of the claim,” and the Commission affirmed this finding. The Commission did not err by determining that the fraud did not render Washington incompetent to prove her own claim. The Commission’s decision that a work-related injury occurred was supported by substantial evidence and, therefore, not arbitrary and capricious.
¶ 42. Additionally, the Commission found that Washington’s conduct raised some significant questions, rendering hers a doubtful claim which the Commission was duty-bound to resolve in her favor. Woodland argues that the Commission erred as a matter of law by finding that it was duty-bound to resolve its doubt about Washington’s claim in her favor. However, the Commission’s application of the law was eminently correct. Because the law mandates that “where there is doubt, cases are to be resolved in favor of compensation.” Gen. Elec. Co. v. McKinnon, 507 So.2d 363, 366 (Miss.1987). “[Djoubtful cases are to be resolved in favor of compensation so that the beneficent purposes of the act may be achieved.” Robinson, 523 So.2d at 332. Having found Washington’s claim to be a doubtful one, the Commission properly resolved that doubt in Washington’s favor consistent with the beneficent purposes of the Act.
II. WHETHER THE PUBLIC POLICY OF MISSISSIPPI MANDATES THAT WASHINGTON FORFEITED HER RIGHTS TO FUTURE BENEFITS BY COMMITTING THE CRIME OF WORKERS’ COMPENSATION INSURANCE FRAUD.
*358 ¶ 43. Woodland implores this Court to adopt “a public policy exception that allows the termination of benefits when a claimant commits workers’ compensation insurance fraud.” As authority for this Court’s power to declare public policy, Woodland cites McArn v. Allied Bruce-Terminix Co., Inc., 626 So.2d 603, 607 (Miss.1993), in which the supreme court developed a narrow public policy exception to the employment-at-will doctrine. The exception is applicable to situations where an employee refused to participate in an illegal act or was discharged for reporting the illegal acts of his employer. Id. McAm effectively overruled prior case law holding that an employee terminated under those circumstances had no legal recourse. Id.
¶ 44. This Court declines Woodland’s invitation to declare that public policy bars the receipt of workers’ compensation benefits when a claimant has committed workers’ compensation fraud. While McAm is authority for the judiciary’s power to modify the common law, Mississippi’s Workers’ Compensation Law is a legislative creation providing for the payment of insurance benefits to injured workers. Miss.Code Ann. § 71-3-1 (Rev. 2000). The Legislature alone has the power to create and modify statutes. Finn v. State, 978 So.2d 1270, 1272-73(¶ 9) (Miss.2008) (citing Miss. Ethics Comm’n v. Grisham, 957 So.2d 997, 1003(¶ 14) (Miss.2007)). This Court may not insert provisions into a statute that the Legislature did not see fit to enact; to do so would oven-each our judicial authority. Id. In this instance, the Legislature did not include a provision in the Workers’ Compensation Law that would cause the forfeiture of benefits if the claimant committed insurance fraud. Instead, the Legislature vested the Commission with the duty to determine the viability of claims, including the authority to reject claims that are not credible. Miss.Code Ann. § 71-3-1. Because the enactment of such a provision lies firmly within the legislative sphere, we decline to create an exception to the Workers’ Compensation Law that would mandate a forfeiture of benefits. We further note that such a provision would violate the well-established precept that the provisions of the Workers’ Compensation Law are to be construed liberally and doubtful cases are to be resolved in favor of compensation. This issue is without merit.
¶ 45. THE JUDGMENT OF THE CIRCUIT COURT OF HANCOCK COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART TO THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE PARTIES.
LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.

. Clearly, this referred to Dr. Smith's prior recommendation for lumbar surgery.

. Rule 9 provides in part:
Upon proper showing by any party of interest that the injured employee is suffering from improper medical attention or lack of medical treatment, further medical treatment may be ordered by the Commission or Administrative Judge at the employer's expense. If at any time during such period the injured employee unreasonably refuses to submit to medical or surgical treatment, the Commission or Administrative Judge shall, by order, suspend the payment of further compensation during such time as such refusal continues and no compensation shall be paid at any time during the period of such suspension.
Any hearing required by the Commission or Administrative Judge under this Rule may, in the discretion of the Commission or Administrative Judge, be held no sooner than *352 five (5) days after notice to determine (1) if compensation payments should be suspended for refusal or failure to submit to a medical examination or to proper medical treatment or (2) that the injured employee is suffering from improper medical attention or lack of medical treatment.