GRIFFIS, P.J., FOR THE COURT:
¶ 1. Timothy Price appeals the Mississippi Workers' Compensation Commission's denial of his workers' compensation claim. We find no error and affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. Price was employed by MTD Products from 1989 to 2012. MTD manufactures lawn equipment, including lawnmowers, snow blowers, edgers, and tillers. Price's primary job was to drive a tow motor, which is a modified forklift. Price would use the tow motor to pick up and transport boxes. However, if the production line became backed up or there were problems with the products coming down the general assembly line, Price would have to physically pick up the boxes and stack them on the floor. Price estimated the boxes could weigh up to 120 pounds.
¶ 3. Price alleges he sustained a compensable work-related injury to his neck and lower back on September 6, 2012. Specifically, Price claims he "suffered back and neck injuries, stemming from loading heavy boxes and from twisting and bending at work." He filed a petition to controvert on May 14, 2013. An evidentiary hearing was subsequently held before an administrative judge. A summary of the evidence is as follows:
*902 Lay evidence
¶ 4. Price testified that he presented to work on September 6, 2012, around 6 a.m., feeling "fine." However, around 1 to 1:30 p.m., he "all of the sudden started feeling pain." According to Price, he advised his supervisor, David Swain, that he hurt his neck and back lifting lawnmowers. Price testified that Swain instructed him to see Janice Moore, MTD's occupational nurse, who advised him to go to Med Serve for treatment.
¶ 5. Price went to Med Serve on September 7, 2012, and saw Dr. Timothy Albers. Price claimed he told Dr. Albers that he was hurt at work. Price subsequently went to Baldwyn Family Medical on September 18, 2012, where he saw nurse practitioner Pam Hodges.
¶ 6. Price stated that his group health carrier was paying for his treatment since he did not know about workers' compensation. However, Price admitted that he went through yearly training at work, during which he was instructed on reporting work-related accidents. Price further acknowledged watching PowerPoint presentations wherein he was instructed to always report work-related injuries.
¶ 7. Price applied for and received Family Medical Leave Act (FMLA) leave and short-term disability for twenty-six weeks, beginning September 18, 2012. He completed an Employee's Report of Incident or Injury on October 31, 2012.
¶ 8. Swain, Price's supervisor, testified that he did not recall Price reporting a work-related injury on September 6, 2012. Instead, Price complained of a backache and stated that his back had been hurting for a long time. Price asked to take off the next day to go to a doctor's appointment, which he had already scheduled. Swain stated that he would have completed a supervisor's accident report on September 6, 2012, had Price reported a work-related injury. However, Swain did not complete an accident report until November 1, 2012, after he was notified by Moore of Price's allegations.
¶ 9. Moore, MTD's occupational nurse, testified that she had no recollection of Price reporting a work-related injury to either his back or neck on September 6, 2012. She further testified that had Price reported a work-related injury, she would have documented the complaints and instructed Price's supervisor to complete an accident report. Additionally, Moore stated that had Price reported a work-related injury, she would have sent him to Express Care South, not Med Serve. Moore explained that she did not use Med Serve for work-related injuries, but instead sent injured workers to Express Care South.
¶ 10. Moore testified that she was first notified by Price of his work injury on October 30, 2012, by telephone. She advised Price that he would need to return to the office to complete an injury report. Price reported to her office October 31, 2012, and completed the report.
¶ 11. Teresa Dye, the human resources coordinator at MTD, confirmed that Price applied and was approved for FMLA and short-term disability. Dye stated Price never advised of a work-related injury and would not have been eligible for short-term disability had his injury been work-related.
Medical evidence
¶ 12. Medical records from Aurora Spine Centers show Price presented to Dr. Walter Eckman on October 5, 2009, approximately three years prior to his alleged work injury, with a chief complaint of low back pain. The records note that Price had experienced "[c]hronic intermittent low-back and neck pain for 4 years."
*903 ¶ 13. Medical records from Med Serve indicate that on September 7, 2012, the day after his alleged injury, Price presented to Dr. Albers with a chief complaint of neck and back pain. According to Dr. Albers's notes, Price had experienced pain "on and off since 2008" and had "long-standing cervical and lumbar pain." However, Dr. Albers noted "[n]o discrete history of trauma to neck or low back." The notes further reflect that Price had previously received epidurals for pain and wanted to pursue this option again, as his pain had "significantly worsen[ed] over the past couple of months."
¶ 14. The medical records from Price's September 7, 2012 visit do not indicate an acute injury or "sudden" pain, as described by Price, nor do they support Price's assertion that he told Dr. Albers he was injured at work.
¶ 15. On September 10, 2012, an MRI of both the cervical and lumbar spine was performed, which indicated cervical and lumbar spondylosis, and multilevel cervical and lumbar disc bulges. Thereafter, on September 18, 2012, Dr. Albers diagnosed Price with degenerative disc disease, degenerative joint disease, chronic neck and low-back pain, and spondylosis. Price was excused from work until September 27, 2012.
¶ 16. Price saw nurse practitioner Hodges at Baldwyn Family Medical Clinic on September 18, 2012. The medical records show Price complained of back pain and stated he was unable to work. However, the medical records do not reflect that Price reported a work-related injury or stated that his pain was work-related. Instead, Price described the duration of his pain as "3 y[ea]rs."
¶ 17. Neurosurgeon Dr. Glenn Crosby II testified by deposition that he first saw Price on October 26, 2012, for an evaluation of his neck and low back. Price described his low-back pain as "chronic in nature" and "felt his back pain was related to the type of work he did." Price indicated that his neck pain was "more acute" and "was aggravated in mid-September when he was doing fine without neck pain and was injured at work lifting some heavy objects, [and] had immediate neck pain."
¶ 18. Dr. Crosby's impression was that Price had a work injury, which caused a cervical disc rupture with severe neck pain. He further found Price's chronic back pain was aggravated by his work conditions. Dr. Crosby performed surgery on February 6, 2013, to repair the ruptured cervical disc. Dr. Crosby last saw Price in June 2013.
¶ 19. Dr. Crosby admitted that he had not reviewed Price's medical records from other physicians prior to his deposition.[1] Moreover, Dr. Crosby admitted that his opinions on causation were based on the history that Price provided to him.
¶ 20. Dr. Samuel Murrell performed an employer medical evaluation on September 9, 2013. Dr. Murrell noted that Price did not mention an acute injury or aggravating event at work to Dr. Albers or nurse Hodges. Dr. Murrell opined that Price's "complaints did not appear de novo from his 09/06/2012[,] but rather represented another of his many episodes for a chronic degenerative problem." Moreover, Dr. Murrell opined there was "no temporary aggravation or structural change in [Price's] underlying degenerative condition as a result of any injury [alleged] to have occurred on or about 09/06/2012."
*904 ¶ 21. Dr. Rodney Olinger, a neurosurgeon, performed an independent medical evaluation (IME) on March 12, 2015, and subsequently issued a written report. In his report, Dr. Olinger noted that he had reviewed the MRI of Price's neck and back and did not see any "acute ruptured disks." Dr. Olinger "agree[d] with a lot of what Dr. Murrell said" and felt that Price's condition was a chronic, longstanding problem. Dr. Olinger opined that "the most [he could] say [was] that [the] episode [on September 6, 2012] may have aggravated the situation but obviously not caused it. The majority of his problem [was] pre-existing."
¶ 22. Dr. Olinger was subsequently deposed and further explained his opinions. He testified during direct examination as follows:
Q. [Dr. Olinger], with regard to his cervical problems, I want you to assume the following: Assume, first of all, that [Price] had no significant cervical symptoms between late 2009 and September 6 of 2012. Further assume that on September 6, 2012 he was driving a forklift for the employer and also lifting heavy boxes. Assume that on throughout [sic] the day he developed cervical pain radiating into his arm but he did not have a particular discrete injury as we discussed earlier. Further assume that he told the employer at the end of the day that he was having problems and that, in fact, the employer is the one that sent him to Dr. Albers the next day, and presume that he subsequently treated and had surgery. Would the neck injury which necessitated this surgery have been caused by the work activities of September 6, 2012 as Price described those activities?
A. Well, I still-I'm not sure-I guess we have to say Dr. Albers, he did not-he didn't mention any problem with work to Dr. Albers, but I guess we'll just assume that-we'll just assume he had an injury on 9-6-2012, and like your hypothetical says and it may not have been, you know, it may have been, you know, happened, you know, within a short time after his work, assume that he did have a new ruptured disc in his neck and he was operated on. Then based on the hypothetical, I would have to say that-and nothing happening in between 2009 and 2012 and he had no problems, then I would have to say that his work injury in the hypothetical was probably the source of his need for surgery.
Q. So, again, if [Price] on September 6, 2012 ... wasn't having problems with his neck, goes to work doing this lifting, doing the driving of the forklift with his arms and such and doing the lifting, develops the problems manifest at work, worsened, get worse to where at the end of the day he's saying I need to see a doctor, would you relate what he was doing at work, would that be the cause of his neck problems?
A. Yes. I mean, that is the most likely cause ....
¶ 23. Dr. Olinger further testified during cross-examination:
Q. Dr. Olinger, you were asked the question whether-you were asked a hypothetical to assume certain facts to be true, that [Price] started work and his symptoms got worse throughout the course of the day and then he went to the doctor. But, [Dr. Olinger], you would agree with me that when he went to see Dr. *905 Albers that's not the history he gave?
A. That's correct.
Q. And you would agree with me that he told Dr. Albers that he was having neck and back pain on and off since 2008 and that he had longstanding neck and back pain?
A. That's what he said.
Q. So the patient's own testimony is the evidence that there had been an ongoing problem between 2009 and 2012, correct?
A. Yes.
Q. You'd agree with that?
A. I certainly agree with that ....
Q. And you would agree that he told Dr. Eckman in October of 2009 that he had intermittent back and neck pain for four years and he had already sought medical treatment before then, correct?
A. Yes.
Q. And, [Dr. Olinger], you were asked about an acute type injury or I think it was termed a discrete injury which there's no evidence that he had a discrete injury in this case. [Price]'s own testimony was that there was not a discrete injury. So removing that discrete type injury from the equation here, do you have patients that have ongoing back and neck problems for a number of years whose symptoms gradually worsen on their own without regard to what they're doing at work on a daily basis, correct?
A. Correct.
....
Q. And without evidence of an acute type injury to him and just a gradual onset as [Price] testifie[d], in conjunction with the history that he gave the day after this alleged work injury that this had been ongoing since 2008 and longstanding, can you give an opinion that the causal factor for the need for surgery was something that happened at work on September the 6th of 2012?
A. The most I could say if I take into account the patient's own statement that he had continued problems is that he aggravated himself at most.
Q. I want you to assume that [Price], the patient that you saw, did not tell his employer ... that there was something that happened at work that day. I want you to assume that he did not report any work-related injury to his employer. Based on his history given to Dr. Albers, that would suggest that it was not related to his work?
A. That's correct, and that's what my original IME basically was saying.
....
Q. In [Price]'s deposition, he did try to relate his symptoms or his testimony was that, you know, his symptoms were something that started at work that day when he was lifting boxes, but his deposition was given in this case in July of 2013, so there was a significant-almost a year, ten months, after this alleged incident occurred before his deposition was given and after, you know, his opportunity to retain counsel in this matter. But his deposition testimony, if he said that this was something that started at work and progressed throughout the course of the day, you would agree with me that that's not the history that was recorded by Dr. Albers and Pam Hodges?
A. It was not the history recorded by those people, that's correct.
*906 ¶ 24. On October 16, 2015, the administrative judge determined Price "suffered a compensable work-related cervical and low back injury in the course and scope of his employment with [MTD] on or about September 6, 2012, when he aggravated his preexisting condition." The administrative judge found Price was entitled to benefits pursuant to the Mississippi Workers' Compensation Act. MTD subsequently appealed.
¶ 25. By order entered June 13, 2016, the full Commission found "that the greater weight of the evidence ... [did] not support a finding of causation required to establish compensability in this claim." As a result, the Commission reversed the order of the administrative judge and dismissed Price's claim. Price timely appealed.
STANDARD OF REVIEW
¶ 26. "The Workers' Compensation Commission is the ultimate finder of fact." Franks v. Foam Craft , 929 So.2d 350, 352-53 (¶ 12) (Miss. Ct. App. 2006). "The findings of the [Commission] are binding on this Court when the Commission's decision is supported by substantial evidence." Id. at 353 (¶ 12). However, "where the Commission has misapprehended the controlling legal principles," the standard of review is de novo. Hugh Dancy Co. v. Mooneyham , 68 So.3d 76, 79 (¶ 6) (Miss. Ct. App. 2011).
ANALYSIS
¶ 27. Price claims the Commission's decision is not supported by substantial evidence in the record. We disagree and find both the lay and medical evidence support the Commission's decision.
¶ 28. In a workers' compensation case, the claimant, Price, must prove by a "fair preponderance of the evidence" each of the following elements: "(1) an accidental injury, (2) arising out of and in the course of employment, and (3) a causal connection between the injury and the ... claimed disability." Owens v. Washington Furniture Co. , 780 So.2d 643, 645 (¶ 6) (Miss. Ct. App. 2000). Price "has the burden of establishing the essential elements of his claim, leaving nothing to surmise, conjecture, or speculation." Id.
¶ 29. " 'Injury' means accidental injury ... arising out of and in the course of employment without regard to fault which results from an untoward event or events, if contributed to or aggravated or accelerated by the employment in a significant manner." Miss. Code Ann. § 71-3-3(b) (Rev. 2011). "[A]n injury arises out of and in the cour[se] of employment even if it amounts to aggravation or exacerbation of a pre-existing condition." Hedge v. Leggett & Platt, Inc. , 641 So.2d 9, 13 (Miss. 1994).
¶ 30. The lay testimony from Swain, Moore, and Dye shows no contemporaneous report by Price of a work-related injury to or an aggravation of his neck or back on September 6, 2012. Instead, the testimony shows that on September 6, 2012, Price advised Swain that his back had been hurting for a long time and asked to take off the next day to go to a previously scheduled doctor's appointment. This testimony is consistent with the medical records of Dr. Albers, which do not mention a work-related injury, but instead note an ongoing history of neck and back pain. As Dr. Olinger noted, whether the injury at work did occur is in question, as Price did not even mention it to Dr. Albers the following day when such an injury or aggravation "would be fresh on his mind." In fact, the record shows Price waited almost two months to report his alleged work *907 injury to his employer.[2]
¶ 31. Although Dr. Crosby opined that Price's neck and back problems were causally related to his employment, Dr. Crosby acknowledged that he had not reviewed the medical records from the other physicians prior to his deposition but, instead, based his opinions on the history provided by Price. Dr. Crosby was given the opportunity to review the medical records during his deposition and testified that his opinions regarding causation did not change. However, Dr. Crosby emphasized that his causation opinions were based solely on the history provided by Price.
¶ 32. Dr. Crosby testified as follows:
A. But on the day of [Price's] first visit with my office, despite the fact that he had what you've shown me this morning about chronic problems with his spine, he indicated that in mid-September he was doing fine without neck pain at that point when he had an acute injury .... So at that point, I attributed what I was looking at on his cervical MRI as an acute injury .... But based on what he told me, I'm attributing the cervical problems to an acute injury and the lower back to an aggravation of a preexisting problem.
....
Q. Are you able to testify to a reasonable degree of medical probability whether that is an acute condition versus a long-standing or degenerative-type change?
A. Right. So the snapshot of the MRI scan, I don't have prior ones to compare it to. I don't have any way to say when that happened. I can only base that on when the patient tells me his symptoms were aggravated.
Q. And if there is no contemporaneous report of an injury to his employer and no documented injury in his September records, you still find this patient more credible than those physicians and his employer?
A. I do.
Q. Why is that?
A. Well, I'm not comparing his veracity to employers and other physicians. I'm basing it on what he told me that morning.
¶ 33. "When a physician bases his medical opinion on the subjective complaints of his patient, the patient's credibility then becomes the issue for determination by the Commission." Airtran, Inc. v. Byrd , 953 So.2d 296, 300 (¶ 8) (Miss. Ct. App. 2007). Here, the Commission implicitly determined Price to be incredible. See id. Such determination is supported by the record, as Price's reported history to Dr. Crosby is different from what he reported to Dr. Albers and nurse Hodges shortly after his injury. Price's reported history to Dr. Crosby is negated by the medical records following his alleged injury, which do not report sudden or immediate pain, but instead indicate longstanding neck and back pain, with no acute or discrete injury.
¶ 34. Additionally, the medical testimony is conflicting. Dr. Crosby attributed Price's low-back pain to an aggravation of a preexisting condition. However, Dr. Murrell found no aggravation in Price's underlying condition. Although Dr. Olinger opined that the episode on September 6, 2012 "at most ... may have aggravated the situation," he testified during his deposition *908 that he has had patients with ongoing neck and back pain that gradually worsened without regard to their daily work activities. Moreover, Dr. Olinger agreed that assuming Price did not report any work-related injury to his employer, and in light of the history given to Dr. Albers, Price's problems were not related to his work.
¶ 35. "Where there is conflicting medical testimony, the Commission has the responsibility to apply its expertise and determine which evidence is more credible." Washington v. Woodland Village Nursing Home , 25 So.3d 341, 355 (¶ 33) (Miss. Ct. App. 2009). "We will uphold that determination unless it is clearly erroneous." Id .
¶ 36. Here, the Commission reviewed the record, including the conflicting medical testimony, and ultimately determined which evidence was more credible. We cannot say that the Commission's determination was clearly erroneous. As the Commission properly stated in its order, "[Price's] proof on the issue of causal connection must rise above mere speculation or possibility, such as instances where the medical testimony is that it could have been one way just as well as the other." Vardaman S. Dunn, Mississippi Workers' Compensation § 273 (2d ed. 1978); see also S. Brick & Tile Co. v. Clark , 247 So.2d 692, 693-95 (Miss. 1971).
¶ 37. Considering the inconsistencies in Price's testimony, the inconsistencies in his reported medical history, the extended period of time between Price's alleged injury and his report of a work-related injury, and the conflicting medical testimony, we do not find the Commission erred in its determination that Price failed to carry his burden of proof as to causation.
¶ 38. Price claims the Commission "fail[ed] to apply or even acknowledge relevant law" regarding the "compensability of aggravations." However, the Commission correctly noted the necessary elements and burden of proof. At no point in its order did the Commission find, infer, or suggest that an aggravation of a preexisting condition was not a compensable injury. Instead, after "[h]aving thoroughly studied the record in this matter and the applicable law," the Commission simply found the evidence did not support a finding of causation related to Price's alleged injury on September 6, 2012.
CONCLUSION
¶ 39. We undertake only a limited review of the Commission's actions in regard to resolving disputed issues of fact and are not to interfere if we are satisfied that there is substantial evidence in the record to support the Commission's determination. See Mooneyham , 68 So.3d at 79 (¶ 6) ("If supported by substantial evidence, the appellate court is bound by the determination of the Commission 'even though the evidence would convince [us] otherwise, were we the fact-finder.' "). We do not reweigh the evidence and are not authorized to substitute our judgment for that of the Commission. Short v. Wilson Meat House, LLC , 36 So.3d 1247, 1251 (¶ 23) (Miss. 2010).
¶ 40. Overall, we are satisfied that there is substantial evidentiary support for the Commission's determination that Price failed to show the necessary causative link between his employment and his neck and back problems. Thus, we affirm.
¶ 41. AFFIRMED.
LEE, C.J., IRVING, P.J., BARNES, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.

Dr. Crosby was given the opportunity to review Price's medical records during his deposition.

When MTD learned of the alleged work injury on October 30, 2012, the incident was immediately documented. The record provides no explanation of why MTD would be willing to complete an accident report on November 1, 2012, but would not have taken the same steps had Price in fact reported an injury on September 6, 2012.