# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-WC-01277-COA

**FORREST COUNTY GENERAL HOSPITAL**                          **APPELLANT**

**v.**

**FELICIA KNIGHT**                                                      **APPELLEE**

DATE OF JUDGMENT:                  10/26/2023
TRIBUNAL FROM WHICH                MISSISSIPPI WORKERS' COMPENSATION
APPEALED:                          COMMISSION
ATTORNEYS FOR APPELLANT:           JOSEPH O'CONNELL
                                   PAMELA LUCKIE CASTLE
ATTORNEY FOR APPELLEE:             TAYLOR RHUE BRINKLEY
NATURE OF THE CASE:                CIVIL - WORKERS' COMPENSATION
DISPOSITION:                       AFFIRMED - 05/20/2025
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., WESTBROOKS AND WEDDLE, JJ.**

**BARNES, C.J., FOR THE COURT:**

### Procedural History

¶1.     Felicia Knight, a Forrest County General Hospital (FCGH) employee, sustained injuries to her right knee and lower back from a fall at work. Knight filed a petition to controvert with the Mississippi Workers' Compensation Commission (MWCC) on December 2, 2019. She also filed a motion to compel treatment, requesting that FCGH pay for right knee surgery recommended by her orthopedic surgeon, Dr. Ross Ward. FCGH filed an answer, disputing the effects and consequences of Knight's alleged injuries, including the compensability of her knee surgery.

¶2.     After a hearing, the administrative judge (AJ) issued an order on February 5, 2020,

finding that Knight's knee surgery was "reasonable, necessary and related to the work accident of June 29, 2019 and, therefore, the responsibility of the employer herein subject to payment under the Fee Schedule." FCGH petitioned the Commission for review of the AJ's decision on an interlocutory basis. The Commission granted the petition and heard arguments on May 18, 2020, and June 5, 2020. The Commission upheld the AJ's order finding the knee surgery was compensable.

¶3. After Knight achieved maximum medical improvement (MMI) for both her knee and back, the AJ conducted a hearing on June 23, 2022, to address the following issues:

(1) whether Knight "suffered an injury to her lumbar spine as a result of the slip and fall on June 29, 2019";
(2) "the nature and extent of temporary disability suffered by [Knight] as a result of the June 29, 2019, slip and fall injury";
(3) "the extent of permanent disability and resulting industrial loss of use and loss of wage-earning capacity contributable to her injuries, if any";
(4) "whether any award for permanent disability should be . . . reduced or apportioned due to any pre-existing disability";
(5) "whether [Knight] is entitled to penalties and interest on any unpaid disability benefits"; and
(6) "whether [Knight] is entitled to continuing medical treatment."[1]

The AJ heard testimony by Knight and her FCGH coworkers, as well as from Ty Pennington, a vocational rehabilitation consultant. The AJ also reviewed Knight's medical records and the depositions of Bruce Brawner (a vocational rehabilitation counselor), Dr. Ross Ward, Dr. Christopher Burks, and FCGH's expert Dr. James Thriffiley.

---

[1] The parties stipulated that Knight suffered injuries to her right knee and right lower extremity and that her average weekly wage was $1,141.26.

¶4. The AJ issued an order on October 14, 2022, holding that Knight's low back injury consisted of a sprain and was compensable. However, finding no substantial evidence of any loss of wage-earning capacity (LWEC), the AJ determined that Knight was not entitled to permanent disability benefits as a result of the back injury. The AJ further ruled that Knight had suffered an 80% industrial loss of use to her right leg but that her award should be apportioned and reduced by 25%. The result was that Knight's net industrial loss of use award was reduced to 60%.

¶5. Knight appealed the AJ's decision to the Commission. Knight argued that the AJ erred by (1) finding she suffered no disability or LWEC due to her lower back injury and (2) apportioning the award for her right-leg injury. FCGH filed a cross-petition for review, claiming the AJ erred by (1) finding a compensable claim for the knee-replacement surgery, (2) awarding permanent disability benefits for Knight's right leg injury, (3) finding Knight is entitled to continuing medical benefits for her right leg injury, and (4) finding Knight was still experiencing a work-related lower back condition.

¶6. On October 26, 2023, the Commission entered its order, affirming the AJ's ruling "that Knight suffered a 25% medical impairment rating to her right leg and an 80% industrial loss of use of that member" and that the apportionment for the industrial loss of use of that member should be reduced to 60%. However, the Commission reversed the AJ's finding "that Knight suffered no disability for losses in wage-earning capacity due to her low back injury." The Commission determined that Knight "suffered a 15% loss" in wage-earning

3

capacity and was "entitled to continuing medical benefits for treatment of her back injury as long as the medical treatment is reasonable, necessary, and related to the work injury."[2]

¶7.     Appealing the Commission's order, FCGH claims that the apportionment ruling was not based on proper evidence and that there was no substantial evidence to support the award of disability benefits for the low back injury.  Finding no error, we affirm.

## Statement of Facts and Medical Evidence[3]

¶8.     On June 29, 2019, Knight, an echocardiographer with the cardiac catheterization lab (CCL) at FCGH, slipped and fell as she was walking into a break room.  She was treated in the hospital's emergency department, reporting pain in her right knee, right hip, and right side of her lower back.  X-rays were normal and showed no acute fractures.  She sought follow-up care with FCGH's employee health services on July 3, 2019 and July 8, 2019. Knight had no specific complaints of knee pain.  Nurse practitioner Jonathan Whitehead confined his assessment to a lumbar strain and right hip pain.  From July 8, 2019 to October 28, 2019, Knight continued working full time in the CCL without restrictions, seeking no medical treatment for her lower back, right hip, or right knee.

¶9.     On October 28, 2019, Knight returned to Whitehead with complaints of right knee pain.  Whitehead's notes stated:

---

[2] The Commission also reaffirmed its prior decision that "Knight's knee replacement surgery was work related, reasonable, and necessary."  FCGH has not appealed this ruling.

[3] Due to the voluminous record, we have restricted our discussion to the relevant facts and evidence necessary to address the issues raised by the parties.

> 38-year-old female states that she was at work Friday and started having some discomfort in her right knee. She states that she worked all weekend [and] has not been able to rest her right knee. Patient states that she had a fall over this past summer and was seen by myself at FMRC. X-rays were taken which showed no degeneration. Patient states that she does not have any pain at all for the past several months, but pain returned all of a sudden this weekend.

A week later, Dr. Joseph Cox, an orthopedic surgeon at Hattiesburg Clinic, reviewed Knight's x-rays from June 29, 2019, and an MRI of Knight's right knee from October 30, 2019; both disclosed degenerative changes in her right knee. Dr. Cox noted Knight had primary localized osteoarthritis of her right lower leg with an aggravation of that pre-existing arthritis. Dr. Cox administered a knee injection, and he noted that Knight "could return to sedentary duty desk work at this time."

*Dr. Ross Ward*

¶10. Knight sought a second opinion from Dr. Ward with Southern Bone & Joint Specialists P.A. on November 21, 2019. Dr. Ward noted:

> [Knight] has been treated thus far by Dr. Cox. He has treated her very appropriately with anti-inflammatories, physical therapy, intraarticular steroid injection and work modification. She has essentially been on sit-down duty for the last six weeks or so. She has failed to have significant relief of pain in her right knee. The injury of her knee has significantly affected her activities of daily living in her daily life. . . . Prior to her injury she had no pain in her knee and never knew that she had anything wrong with her knee. It has been suggested by the physical therapist that she undergo surgical intervention and that she has reached maximum benefit from physical therapy.

Dr. Ward's notes also stated: "X-rays of the right knee, weightbearing flexed views, show bone-on-bone in the medial compartment of the right knee with subchondral sclerosis and osteophytes noted." He felt that the only available option was a "right total knee

5

arthroplasty," which would require Knight "to be off work for approximately four weeks at which time she can resume some sit-down work." Dr. Ward performed the knee surgery on July 23, 2020. Two months later, Knight returned to Dr. Ward complaining of worsening pain in her lower back, right hip, and thigh. He prescribed physical therapy and placed her on sedentary work duty.

¶11. Dr. Ward released Knight to return to full duty at work on February 23, 2021. However, on May 5, 2021, Knight reported swelling of her right knee to Dr. Ward. An x-ray showed (a) "no interval changes" when compared to prior x-rays, (b) "well-fitting femoral and tibial components with no notching or femoral or tibial overhang," and (c) her "[p]atella appear[ed] to be in appropriate position." Dr. Ward administered a steroid injection and advised Knight to "be off work" for approximately six weeks.

¶12. On June 15, 2021, Knight returned to Dr. Ward with pain in her right knee. Dr. Ward prescribed therapy and a lumbar epidural injection. He advised Knight to return to work in approximately one month. On July 13, 2021, Knight reported to Dr. Ward that her right knee still had some swelling. Dr. Ward prescribed a compression sleeve for her knee and continued physical therapy. He directed Knight to stay home from work and to return in eight weeks.

¶13. Dr. Ward placed Knight at MMI on September 14, 2021, and assigned a 25% permanent partial impairment rating to her right lower extremity. On November 30, 2021, Knight returned to Dr. Ward, who noted Knight had multiple "nebulous" complaints that

were "different than when [he] saw her on September 14, 2021." In an addendum to his notes, Dr. Ward stated that although Knight had "complained of not being able to fully flex or extend her knee," she appeared to have full extension but with some global tenderness. Dr. Ward further noted that Knight "did seem to rise quickly from [the] exam chair and go down the hall without much of a limp, if any, and at a rather brisk pace." Dr. Ward felt that the best option was for Knight to get a functional capacity examination (FCE) to determine her restrictions.

¶14. In a deposition on December 3, 2021, Dr. Ward stated his belief that Knight's pre-existing primary knee osteoarthritis and her June 29, 2019 fall were *both* contributing factors to her need for knee surgery. Dr. Ward testified that she needed the surgery not only because of the meniscal extrusion, but because she also had "significant arthritis in the knee" and "some bone contusions noted [on] the MRI." When asked if he would follow "Table 16-3 that deals with primary knee joint arthritis" from the AMA's *Guides to the Evaluation of Permanent Impairment* (6th ed.) (AMA Guides) in apportioning Knight's impairment rating, Dr. Ward replied, "Not for me personally." Instead, Dr. Ward stated that he would "look at how severe the arthritis was prior to the injury and whether or not the person had had any symptoms pre[-]injury to determine that." Dr. Ward apportioned "75 percent being from the injury, 25 percent from the preexisting arthritis." Reviewing Knight's FCGH job description with regard to her knee injury, Dr. Ward testified that Knight could return to work on a full-time basis with the limitations that she would not be able to run, crawl, or crouch.

7

*Dr. Michael Patterson and Dr. Richard Clatterbuck*

¶15.    On October 5, 2020, Knight was evaluated and treated by Dr. Patterson, an orthopedic spine specialist with Southern Bone & Joint Specialists P.A., for her complaints of back pain. Lumbar spine x-rays showed "no lytic or blastic lesions"; "a mild scoliotic curvature to her thoracic spine that [did] not extend into the lumbar spine"; diminishment of the L5-S1 and L3-4 discs; "a mild retrolisthesis . . . of about 2 mm"; and "significant facet joint arthrosis at L3-4 and L4-5." Dr. Patterson's diagnosis was "right-sided radiculitis, mostly likely L3 accompanied by low back pain following a work injury."

¶16.    Knight underwent a lumbar MRI, which showed an intradural mass behind the L3-4 disc. Dr. Patterson referred Knight to neurosurgeon Dr. Richard Clatterbuck, who determined the scan was most consistent with "a benign nerve sheath tumor that ha[d] likely been present for years and is slowly growing." Dr. Clatterbuck noted that "the relationship of the mass to her current symptoms [was] unclear." He explained to Knight "that surgery may or may not improve her current symptoms depending on their cause."

¶17.    On November 19, 2020, Knight had a follow-up visit with Dr. Patterson to discuss the surgery recommended by Dr. Clatterbuck. Dr. Patterson talked with Knight about her low back pain, which was unrelated to the intradural mass, and he told Knight he would be happy to follow her for that issue after surgery. Dr. Clatterbuck performed the surgery on December 1, 2020. Post-surgery, Knight reported that her back and leg pain/numbness had neither worsened nor improved. Dr. Clatterbuck observed that her mobility and gait

appeared to have improved.[4]

¶18.   Knight returned to Dr. Patterson on December 31, 2020, for treatment of her mechanical back pain.  Dr. Patterson noted Knight had "degenerative disk disease with disc collapse worse at L3-4, desiccated discs at L3-4, 4-5, and S-1, and mild facet joint arthrosis." Dr. Patterson treated Knight with "diagnostic facet joint injections from L3 to the sacrum," and he prescribed physical therapy and "dry needling."  He advised her not to return to work until "her symptoms reduced somewhat," but he thought she would be able to return to restricted work once her pain had decreased.  Dr. Patterson performed another diagnostic facet joint injection two weeks later.

¶19.   At her follow-up visit on February 1, 2021, Dr. Patterson's diagnosis was "[s]pondylosis without myelopathy or radiculopathy, lumbosacral region," and he recommended she continue physical therapy.[5]  When Knight returned to Dr. Patterson on March 4, 2021, he noted she had lost thirteen pounds and was making good progress and "moving towards likely an FCE and impairment rating."

¶20.   Knight returned to Dr. Patterson on May 10, 2021.  Her MRI revealed she had an "isolated degenerated disk at L3-4" where the schwannoma had been.  He ordered physical

---

[4] The parties do not dispute that the lumbar mass was not related to Knight's injury or her workers' compensation claim.

[5] Dr. Patterson also referred Knight to Dr. Douglas Tucker for a radio-frequency ablation (RFA).  Dr. Tucker performed an RFA of the bilateral L2, L3, L4 and L5 medial branches on February 12, 2021.  His post-operative diagnosis was lumbosacral spondylosis without myelopathy.

therapy. A lumbar MRI scan performed on May 27, 2021, showed:

1. Interval resection of the L3-4 intraspinal mass with no residual or recurrent neoplasm identified.
2. Mild L3-4 and minimal L5-S1 disc bulges. The spinal canal and neural foramina are widely patent throughout the lumbar region, and there is no evidence for disc herniation.
3. Mild thoracolumbar curvature convex left.

On June 16, 2021, Dr. Patterson administered an epidural injection, which initially provided Knight relief from her right leg pain. However, on July 5, 2021, Knight told Dr. Patterson that her back pain had returned. Dr. Patterson advised Knight that if she did not lose weight, it was not likely that she would see improvement. Knight had another L3-4 epidural steroid injection on August 4, 2021.

¶21. Dr. Patterson placed Knight at MMI for her back pain on September 20, 2021, noting she "has no pain in her words"; so he ordered an FCE.

**Return to Work/Vocational Evidence**

*FCGH Echocardiographer Job Description*

¶22. According to the job description, an FCGH echocardiographer "performs and calculates 2D/M-Mode and color flow doppler echocardiograms, TEEs, structural heart procedures and assist[s] in other non-invasive areas when necessary." The physical requirements of the job include constant walking, balancing, lifting, carrying, turning, standing, pushing, and pulling. It also requires frequent stooping.

*Functional Capacity Examination*

¶23. The FCE was conducted on December 21, 2021, "to determine [Knight's] tolerance

10

to perform work tasks." The January 25, 2022 FCE report stated that Knight "demonstrated the ability to perform 79.9% of the physical demands of her job[.]" Knight's ability to perform was within the sedentary physical demand, which was "below her jobs demand category" of medium. The FCE recommended modifications to her work cart "to facilitate increased success with work and reduced pain with prolonged standing." The FCE concluded that according to Table 17-4 of the AMA Guides, "[Knight] best meets the Class 1 on the Lumbar Spine Regional Grid due to her L3/4 disc herniation" and "[t]he default impairment for this is listed at a 7%, with a range of 5-9%." The FCE "recommended that [Knight] receive a 9% Whole Person Impairment."

*Dr. James Thriffiley*

¶24. The parties deposed orthopedic surgeon Dr. James Thriffiley on April 26, 2022. After reviewing Knight's medical records, Dr. Thriffiley concluded that Knight had a pre-existing medical condition (arthrosis) in her right knee. Dr. Thriffiley opined, based on a reasonable medical probability, that Knight had arthritis present at the time of her fall, and he explained, "It is most likely no change from much earlier than June of 2019."

¶25. Dr. Thriffiley discussed how apportionment for Knight's right knee would be calculated under the methodology prescribed by the AMA Guides and determined that Knight's post-treatment, post-MMI impairment rating would be less than the impairment attributable to her pre-existing osteoarthritis.

*Dr. Christopher Burks*

11

¶26. On May 16, 2022, the parties deposed Dr. Burks, an orthopedic surgeon who had conducted an employer's medical evaluation (EME) of Knight on April 14, 2021. He opined that Knight's "mechanism of injury and complaints were fairly consistent with right-sided sacroiliac [(SI)] joint irritation or dysfunction." With regard to the FCE's 9% whole body impairment rating, Dr. Burks stated:

> I believe the AMA Guidelines for recalcitrant SI joint dysfunction with trauma is 5 to 8 percent depending on a couple of modifiers. I'm not 100 percent sure. . . . I would have just diagnosed her with a lumbar sprain, myofascial pain, some mild residual subjective pain symptoms which would carry with it usually an impairment rating of 1 to 2 percent. I can't do the calculation with adding the total arthroplasty in my head.

He further noted there was "no evidence in any of the imaging studies" that Knight "experienced a disc herniation in her fall at work on June 20, 2019."

*Vocational Expert Bruce Brawner*

¶27. Brawner provided a vocational evaluation of Knight on May 6, 2022. He noted that Knight had since returned to work at FCGH, and she was "capable of maintaining her position with [FCGH] or any other position for which she is vocationally qualified." Brawner opined that "Knight is capable of earning $15.49 per hour in the types of other jobs which are cited in this report."

¶28. Brawner was deposed on June 17, 2022. Brawner reviewed Knight's job description, the FCE, her medical records, Pennington's report, and the depositions by Dr. Burks and Dr. Thriffiley. Based on the FCE, he determined that Knight's capabilities fell "within the light range." Brawner identified ten jobs—appointment clerk, payroll clerk, receptionist, hospital

12

admit clerk, insurance checker, customer service representative, benefits clerk, insurance clerk, cardiac monitor technician, and stress test technician—that Knight would likely be able to perform. He concluded that the average starting wage for those jobs would be "$15.49 per hour." Brawner also conducted a job survey of specific jobs in the area within Knight's limitations that had an average wage of $13.47 per hour.

¶29. Brawner reviewed FCGH's job description for an echocardiographer, and he noticed it included a lifting requirement of up to 50 pounds, which would place it in the range of medium-level work. He talked with the CCL director of FCGH, Rosa Byrd, and Kandice McCann, a CCL supervisor, to determine whether FCGH's job description was "consistent with the manner in which the job" was actually performed. Both Byrd and McCann described the job as "light," which was consistent with the way it was described by the Department of Labor. Brawner noted that Byrd and McCann "had instructed Ms. Knight not to do any lifting, carrying, pushing or pulling, no greater than her documented restrictions" and to get assistance from a nurse if she had problems positioning a patient.

¶30. When Brawner was asked about Pennington's April 2022 report, Brawner noted Pennington's opinions were "based on the assumption that full sedentary work could be performed." Brawner thought the therapist conducting the FCE had misclassified the physical demand level of the work Knight could perform.

*Vocational Expert Ty Pennington*

¶31. The parties deposed Pennington on June 8, 2022, who had generated two reports on

13

Knight—one on April 21, 2022, and one on May 10, 2022. In his April 2022 report, Pennington was asked to provide an opinion with regard to Knight's labor-market access or the impact of her injury while working at FCGH and how the assigned restrictions would impact her access to the labor market. Pennington reviewed Knight's educational background, work history, and transferrable skills, and he gave his opinion with regard to her loss of access. Pennington provided two scenarios in the report regarding Knight's access to the market based on the FCE and Dr. Patterson's ultimate opinion. Pennington testified that Knight's bilateral lifting on the FCE was zero pounds, and if an individual is unable to lift from floor to waist, or bilateral lift, that would have an impact on her ability to be able to perform work.

¶32. Based on Dr. Patterson's opinion that Knight could return to sedentary work under the FCE, Pennington's second scenario based his analysis on the full level of sedentary-level work. He opined there is a range of the loss of access from 64% to 89%. If Knight's bilateral lifting was more in line with the level of work on the sedentary level, Pennington's opinion would be the second scenario with regard to her loss of access. Pennington testified that all his opinions were given to a reasonable degree of vocational rehabilitation probability.

¶33. Pennington's May 2022 report was a labor-market survey, in which he identified six jobs in Knight's geographic area. He opined that based on the jobs identified, Knight's residual wage-earning capacity in an open and competitive job market, given her restrictions,

14

would range from $10.86 to $15.00 an hour. This finding was based on the assumption that Knight was capable of performing the full range of sedentary work. Reviewing Brawner's vocational report, Pennington said he was "not 100 percent clear" how Brawner determined Knight's earning capacity was $15.49 an hour. Pennington determined that based on FCGH's job description for an echocardiographer, the job fell "outside of the restrictions and limitations that [Knight's] been assigned."

## STANDARD OF REVIEW

¶34.    "It is well-settled law in this State that the Commission is the ultimate finder of fact in workers' compensation cases, and where substantial credible evidence supports the Commission's decision, then, absent an error of law, the decision must stand without judicial interference." *Eichhorn v. Kroger Co.*, 325 So. 3d 692, 695 (¶11) (Miss. Ct. App. 2021) (quoting *Hayes v. Howard Indus. Inc.*, 284 So. 3d 787, 793 (¶19) (Miss. Ct. App. 2019)). "[W]e will only reverse the Commission's decision if it is not supported by substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law." *Id*. at 695-96 (¶11) (internal quotation mark omitted) (quoting *Hayes*, 284 So. 3d at 793 (¶19)). "Issues of law are reviewed de novo." *Id*. at 696 (¶11).

## DISCUSSION

I.    **Whether the Commission erred in affirming the apportionment of the award for the industrial loss of use for Knight's right leg injury.**

¶35.    The AJ apportioned and reduced the award for loss of industrial use to Knight's right

15

lower extremity by 25% based on Dr. Ward's opinion. FCGH argues that Dr. Ward's assessment was "subjective," amounting "to little more than an estimate." FCGH asserts that the AJ should have instead adopted the opinion given by Dr. Thriffiley in calculating the apportionment of permanent partial impairment. Using the AMA Guides, Dr. Thriffiley determined that Knight's final post-treatment impairment rating was less than the impairment attributable to her preexisting osteoarthritis. He determined that Knight's final impairment rating with apportionment was negative 29%.[6]

¶36. Our Court has held, "Where there is conflicting medical testimony, the Commission has the responsibility to apply its expertise and determine which evidence is more credible." *Washington v. Woodland Village Nursing Home*, 25 So. 3d 341, 355 (¶33) (Miss. Ct. App. 2009). The AJ acknowledged in his order that "there was conflicting but compelling evidence that [Knight] did at least have some issues with her knee prior to the fall," and he relied on Dr. Ward's impairment rating of 25% in apportioning the award accordingly. The Commission affirmed this ruling. The Commission found Dr. Ward's testimony "more credible" than that of Dr. Thriffiley's, particularly noting that Dr. Thriffiley had not examined Knight.

¶37. FCGH asserts "that a treating physician's assessments and opinions should be disregarded when they are based on an inadequate or incomplete examination compared with

---

[6] As FCGH notes, the "need for apportionment is not in dispute." FCGH merely challenges the methodology for calculating apportionment "and the degree of apportionment that should be found to exist."

a thorough and adequate examination by another medical doctor." *See Smith v. Commercial Trucking Co. Inc.*, 742 So. 2d 1082, 1084-87 (¶¶9-13) (Miss. 1999)*; Johnson v. Ferguson*, 435 So. 2d 1191, 1194-96 (Miss. 1983). Unlike these cases cited by FCGH, Dr. Ward's opinion was not "based upon an inadequate or incomplete examination." *See Johnson*, 435 So. 2d at 1195. Rather, Dr. Ward treated Knight for more than a year for her right knee injury and conducted proper diagnostic testing to determine the issue. Dr. Ward said that he did not believe Knight was capable of full duty (in relation to her right knee) based on the job-description requirements for an echocardiographer for FCGH, noting that Knight was not capable of running, crawling, or crouching. Dr. Ward also stated that Knight would likely need two revision surgeries in the future. Dr. Thriffiley, on the other hand, never examined Knight, relying on her medical records in making his determination of apportionment.

¶38. The Mississippi Supreme Court held in *Cockrell Banana Co. v. Harris*, 212 So. 2d 581, 585 (Miss. 1968), that "the percentage of apportionment" is to "be determined by the attorney-referee" (or the AJ) "whose order is subject to review by the full [C]ommission, the ultimate fact finding body." The supreme court has further recognized that

> the degree of contribution is not often susceptible of exact proof, with mathematical accuracy. The [C]ommission has a reasonable discretion in apportioning the contribution of the preexisting condition. That percentage is a matter left largely to the sound discretion of the [C]ommission, to be exercised in view of all the circumstances, and upon a fair view of all of the facts. Its conclusion on the degree of contribution is a determination of a question of fact, and will not be changed unless it is not supported by substantial evidence, or is manifestly wrong.

*Se. Constr. Co. v. Dependent of Dodson*, 247 Miss. 1, 15, 153 So. 2d 276, 283 (1963). Dr.

17

Thriffiley even acknowledged that "a physical exam documented by another board certified orthopaedic surgeon . . . [was] reasonable to use as a basis for an impairment rating."

¶39. While we recognize that "the Commission is not required to defer to the opinion and report of the claimant's treating physician," *see Wooten v. Franklin Corp.*, 9 So. 3d 1182, 1185 (¶13) (Miss. Ct. App. 2009), in this instance, the AJ and Commission appropriately evaluated and weighed the evidence and found Dr. Ward's opinion regarding apportionment to be credible. Finding substantial credible evidence to support the ruling regarding apportionment, we determine that the AJ and Commission did not commit error in apportioning the award based on Dr. Ward's opinion.[7]

> **II. Whether the Commission erred in reversing the AJ's ruling that Knight was not entitled to disability benefits for her back injury and in awarding her permanent partial disability benefits for the injury.**

---

[7] FCGH requests that this Court "recognize and hold that to the extent AMA's Guides cover orthopedic injuries and conditions, it should be required for determining apportionment, just as it is required for determining post-injury, post-MMI impairment ratings." *See, e.g.*, Miss. Workers' Comp. Med. Fee Schedule, Gen. R. IV.A, at 7 ("In determining the extent of permanent impairment attributable to a compensable injury, the provider shall base this determination on the most current edition of the Guides to the Evaluation of Permanent Impairment, as published and copyrighted by the American Medical Association which is in effect at the time the service is rendered."), *available at* 20 Miss. Admin. Code Pt. 2, Ch. 2 (effective Nov. 15, 2022). We find this issue is better suited for the Commission or this state's legislative branch to address. *See, e.g.*, Vt. Stat. Ann. tit. 21, § 648 (requiring "the existence and degree" of PPI be made in accordance with AMA Guides); Iowa Code Ann. § 85.34 (providing "the extent of loss or percentage of [PPI] shall be determined solely by utilizing the [AMA Guides]"). Accordingly, we leave the issue of whether the AMA Guides is appropriate in calculating apportionment to be determined by the finder of fact on a case-by-case basis.

18

¶40. The AJ determined that while Knight suffered "an injury to her lumbar spine," there was "no substantial evidence to support that the claimant suffered any disability and certainly not any loss of wage-earning capacity from her back sprain/mechanical back pain." The Commission reversed this ruling. Noting the limitations stated in the FCE and the opinions by "both vocational experts [that] she can no longer earn [her pre-accident hourly wage] in the open labor market," the Commission found that Knight "suffered a 15% loss in wage earning capacity."

### A.    Whether Knight rebutted the presumption of no LWEC.

¶41. First, FCGH argues that the Commission erred in finding Knight overcame the presumption of no LWEC. Knight and her coworkers received an additional $5.41 per hour pay raise on May 6, 2022, shortly after Knight had returned to work. Thus, Knight's post-injury wage was higher than her pre-injury wage.

¶42. As the Commission acknowledged, "A rebuttable presumption of no [LWEC] arises when the claimant's post-injury wages are equal to or exceed his preinjury wage." *Gregg v. Natchez Trace Elec. Power Ass'n*, 64 So. 3d 473, 476 (¶12) (Miss. 2011). However, a claimant can rebut this presumption by presenting evidence "that the post-injury earnings are unreliable due to [an] increase in general wage levels since the time of accident, . . . and the temporary and unpredictable character of post-injury earnings." *Id*. "Any factor or condition which causes the actual post-injury wages to become a less reliable indicator of earning capacity will be considered." *Id*.

19

¶43. Because the raise Knight received was given to all CCL employees "to get their pay up to market value," the Commission affirmed the AJ's determination "that Knight rebutted the presumption by showing that her post injury earnings are unreliable due to an increase in general wage levels since the time of the accident." In *Chambers v. Howard Industries Inc.*, 310 So. 3d 833, 836 (¶9) (Miss. Ct. App. 2021), we found that a claimant had successfully rebutted the presumption of no LWEC because his post-injury wage increase (from $12.83/hour to $13.63/hour) "was a result of an overall increase in general wage levels since his injury." The claimant had also shown that as a result of his injury, he would suffer a decrease in wages in the open labor market. *Id*. For the reasons stated, we likewise find no error in the Commission's holding that Knight had rebutted the presumption of no LWEC.

### B. Whether the Commission erred in finding Knight suffered a LWEC.

¶44. FCGH contends that "the evidence relating to the actual requirements of an echocardiographer's job at [FCGH] clearly establishes that the limitations on which the Full Commission relied have no bearing on Ms. Knight's actual duties on the job, which she was clearly able to perform." Specifically, the hospital notes that "lifting to shoulder height and overhead have nothing whatsoever to do with the work of an echocardiographer" and that the job does not require "heavy lifting." FCGH also claims that the evidence showed her complaints of low back pain were "not casually related to a work injury." Lastly, FCGH asserts that the Commission erred by relying on the loss-of-access analysis by Pennington, claiming Knight's return to work "trumps and overrides any loss of access analysis."

20

¶45.    The Commission determined that Knight suffered a LWEC, finding:

> Based on the FCE, it is clear Knight cannot physically do what she was able to do before her June 29, 2019, accident. She now has substantial limitations with lifting to shoulder height and overhead, with carrying, and with pushing and pulling. She is also limited to work within the sedentary physical demand category, which is two categories below the medium physical demand requirements of her job as a cardiac sonographer. Further, the FCE showed she can perform only 79.9% of the physical demands of her job. Knight was able to return to her pre-injury job only with accommodations.

The Commission further noted that Pennington "thinks she has suffered a 64% to 89% loss of access to the labor market" and that Knight had "applied for at least seven jobs . . . within her restrictions and near her residence" without success during the month between reaching MMI and being rehired by FCGH.

¶46.    In determining a claimant's LWEC, the Commission considers several factors:

> (1) an increase in general wage levels, (2) increased maturity or training, (3) longer hours worked, (4) sympathy wages, (5) temporary and unpredictable character of post injury earnings, (6) his inability to work, (7) his failure to be hired elsewhere, and (8) the continuance of pain and any other related circumstances.

*Kroger Co. v. Pybus*, 327 So. 3d 678, 681 (¶8) (Miss. Ct. App. 2021). "A decision regarding the loss of wage-earning capacity is 'largely factual and is to be left to the discretion and estimate of the Commission.'" *Tew v. Siemens Power Transmission*, 156 So. 3d 329, 332 (¶8) (Miss. Ct. App. 2010) (quoting *Bryan Foods Inc. v. White*, 913 So. 2d 1003, 1010 (¶28) (Miss. Ct. App. 2005)). "'[A]ny factor or condition which causes the actual post-injury wages to become a less reliable indicator of earning capacity will be considered,' including the claimant's inability to work, continuing pain, and loss of access to the job market."

21

*Kroger Co.*, 327 So. 3d at 684 (¶19) (quoting *Gen. Elec. Co. v. McKinnon*, 507 So. 2d 363, 365 (Miss. 1987)).

¶47.    In *Howard Industries Inc. v. Hayes*, 392 So. 3d 1216 (Miss. Ct. App. 2022), *aff'd*, 376 So. 3d 1201 (Miss. 2023),[8] we addressed a case factually analogous to the present one. Claimant Selina Hayes suffered injuries to her head, back, and neck in 2007 after falling at work.  *Id*. at 1220 (¶3).  After reaching MMI, Hayes returned to her former job with restrictions.  *Id*.  Her doctor assigned a "2% whole person impairment to her cervical spine and a 5% whole person impairment to her lumbar spine."  *Id*.  The FCE noted that Hayes "could sustain a medium level of work for an eight-hour day," but concluded that "according to the self-reported job demands, [Hayes's] abilities do not match the job requirements," which required heavy lifting.  *Id*. at 1239 (¶64).

¶48.    The Commission affirmed the AJ's findings that Hayes had sustained a LWEC from this injury, and she was awarded permanent partial disability benefits.  *Id*. at 1235 (¶55). Howard Industries argued "that the Commission relied solely on Hayes's vocational experts' testimony of loss of access to open market jobs and that Hayes's post-injury wages were unaffected, creating a presumption of no [LWEC] that Hayes did not rebut."  *Id*.  Noting the unrebutted "vocational testimony . . . concerning her loss of job access on the open market," as well as Hayes's education, work history, and medical impairment, we affirmed the

_____

[8] The sole issue addressed on certiorari review before the Mississippi Supreme Court concerned sanctions and is irrelevant to our discussion.

Commission's finding of a LWEC. *Id.* at 1239-40 (¶¶67-69).

¶49.    As in *Hayes*, there was unrebutted vocational testimony in this case by Brawner and Pennington that Knight could not earn her pre-injury wage in the open market. In addition, the FCE report stated that Knight could only perform 79.9% of the physical demands of her job. The Commission noted that Knight has "substantial limitations with lifting to shoulder height and overhead, with carrying, and with pushing and pulling." This finding is supported by the FCE. The job description for an FCGH echocardiographer also outlines the job's physical requirements, which include constant lifting, carrying, reaching, and standing. As the Commission noted, Knight was able to return to her former job in March 2022 "only with accommodations." An email from Knight's CCL director confirms that accommodations were made in accordance with the FCE report's limitations (e.g., providing her assistance with moving equipment in and out of her car and allowing Knight to "alternate between sitting and standing" as needed). Knight testified before the AJ that it would be difficult for her to return to work without those accommodations. Knight also stated that she still suffered from pain and numbness in her right leg; pain that was not present before her injury. Thus, we find no merit in FCGH's assertion that Knight was able to perform her duties as an echocardiographer "with or without accommodations."

¶50.    In consideration of the deferential standard of review afforded to the Commission's decision, we find the evidence supports the Commission's finding that Knight sustained a LWEC due to her 2019 injury, entitling her to permanent partial disability benefits.

Accordingly, we affirm the Commission's order.

¶51.    **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**